UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                    )
                  Plaintiff,      )
                                    )
     v.                       ) No. 4:19-CR-806-SNLJ-DDN
                                    )
EDWARD WINGO, JR.,          )
                                    )
                  Defendant.     )

EVIDENTIARY HEARING

BEFORE THE HONORABLE DAVID D. NOCE
UNITED STATES MAGISTRATE JUDGE

SEPTEMBER 25, 2020

**APPEARANCES:**

For Plaintiff:      Jillian S. Anderson, AUSA
                       **OFFICE OF THE U.S. ATTORNEY**
                       111 South Tenth Street, 20th Floor
                       St. Louis, MO  63102

For Defendant:     Tyler Keith Morgan, AFPD
                       Felicia A. Jones, AFPD
                       **OFFICE OF THE FEDERAL PUBLIC DEFENDER**
                       1010 Market Street, Suite 200
                       St. Louis, MO  63101

*REPORTED BY:*         *Gayle D. Madden, CSR, RDR, CRR*
                       *Official Court Reporter*
                       *United States District Court*
                       *111 South Tenth Street, Third Floor*
                       *St. Louis, MO  63102     (314) 244-7987*
        *(Produced by computer-aided mechanical stenography.)*

# INDEX

*Witness:*

## THOMAS KEENER
   Direct Examination by Ms. Anderson  . . . . . . . . Page  4
   Cross-examination by Mr. Morgan . . . . . . . . . . Page 16

1          (Proceedings commenced at 8:57 a.m.)

2          (The following proceedings were held in open court and

3     with the Defendant present.)

4               THE COURT:  In the case of the United States against

5     Edward Wingo, Jr., Case No. 4:19-CR-806, the matter is before

6     the Court this morning for an evidentiary hearing on pending

7     motions.  Here representing the United States is Assistant

8     U.S. Attorney Jillian S. Anderson, and representing the

9     Defendant is Assistant Federal Public Defender Tyler K.

10    Morgan, and Mr. Edward Wingo, Jr., I believe, is the

11    individual at the counsel table with Mr. Morgan, and we are

12    going to have a hearing on the pending motions.  There are

13    actually three pending motions:  The oral motion of the

14    Defendant generally to suppress arguably suppressible

15    evidence.  There is the oral motion of the Government for a

16    determination by the Court of the admissibility or not of any

17    arguably suppressible evidence, and then there is the specific

18    documentary motion Mr. Morgan filed to suppress evidence and

19    statements.  So all of that being said, Ms. Anderson, you may

20    begin.

21               MS. ANDERSON:  Thank you, Your Honor.

22               Your Honor, at this time, the Government would call

23    Officer Thomas Keener to the witness stand.

24               THE COURT:  All right.  Step up and be sworn please.

25          (Witness sworn.)

1    THE COURT:  You may begin.

2    MS. ANDERSON:  Thank you, Your Honor.  And before I

3 begin questioning, just by way of, I guess, apology to the

4 Court, I have not fully mastered the ability to breathe

5 without fogging up glasses, and I can't see without them, so I

6 apologize if I have to take a minute to clean them off or --

7    THE COURT:  That's fine.

8                    **THOMAS KEENER**,

9 HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

10 FOLLOWS:

11                    DIRECT EXAMINATION

12 BY MS. ANDERSON:

13 Q    All right.  Officer, can you introduce yourself to the

14 Court and let the Court know a little bit about how you're

15 employed?

16 A    Yes, ma'am.  I'm a police officer with St. Louis County

17 Police Department, and I'm also a task force officer with the

18 FBI's Violent Crime Task Force here in St. Louis.

19 Q    Okay.

20 A    I've been on for about 10 years with the County, a task

21 force officer for about a year and a half now, and with the

22 County, I'm part of a Special Response Unit, which is a unit

23 that is more or less a fugitive apprehension unit.  We also

24 have other responsibilities, but that's our main focus is

25 fugitive apprehension.

1 Q    And how long have you worked as a law enforcement

2 officer, sir?

3 A    Approximately 10 years.

4 Q    Okay.  I want to draw your attention to the date of

5 August 19th of 2019.  Were you working in your capacity as a

6 law enforcement officer on that day?

7 A    I was.

8 Q    And did you have an opportunity on that day to become

9 involved in the arrest of an individual named Edward Wingo?

10 A    Yes.

11 Q    Okay.  Can you let the Court know, prior to that arrest,

12 what information had you received about Mr. Wingo that brought

13 him -- that made him a person of interest to law enforcement?

14 A    So we were contacted by our Division of Criminal

15 Investigation, our Domestic Violence Unit.  One of the

16 detectives reached out to our unit and asked us to help locate

17 an individual named Edward Wingo in reference to a violent

18 domestic assault that had occurred several days earlier.

19 Q    Okay.  All right.  So on that date, on August 19th, you

20 were aware that he was -- was he wanted for that domestic

21 assault that you described?

22 A    Correct.  So we were notified that he was wanted for

23 questioning in reference to that, that assault, and we also

24 were made aware, when we started investigating him, he had

25 also warrants for St. Louis County and St. Louis City as well.

1 Q    And so prior to the arrest attempt, you were aware that

2 he had warrants issued by a court for his arrest?

3 A    Correct.

4 Q    All right.  And can you let the Court know how is it that

5 law enforcement was able to determine where Mr. Wingo was on

6 August 19th?

7 A    As I mentioned earlier, our unit, we do a lot of fugitive

8 apprehension, and so when we get a request from a detective to

9 begin an investigation into locating someone, we start doing

10 research on associates, individuals they're associated with,

11 vehicles they're associated with, and residences or businesses

12 they're associated with.  So we came to find out that he was

13 associated to this, this residence on Melba --

14 Q    Okay.

15 A    -- in Northwoods, there in the St. Louis County area.

16 Q    And to your information, was there an officer that was

17 able to actually get visual confirmation that Mr. Wingo was

18 present at that address on Melba Avenue on August 19th?

19 A    Yes, ma'am.  So one of our officers did a drive-by of the

20 house in the early morning hours and saw the truck we knew

21 Mr. Wingo was known to drive in the driveway, associated with

22 a residence that he was known to be associated with.

23 Q    And do you know; was that officer driving a marked patrol

24 car or an unmarked car?

25 A    That morning, she was driving a marked St. Louis County

1  patrol vehicle.

2  Q    Okay.  And subsequent to that officer locating

3  Mr. Wingo's truck at that residence on Melba Avenue, did other

4  officers join her to effectuate an arrest based on the wanted

5  and the warrants?

6  A    Yes, ma'am.  So she gave us, on the radio, a positive ID

7  that it was indeed Edward Wingo in the Chevy pickup truck in

8  the driveway, and so as we normally do, we have several

9  unmarked and also several marked patrol cars that converge and

10 effect the arrest.

11 Q    Okay.  And you had testified earlier that prior to

12 responding to that location on Melba Avenue to effectuate that

13 arrest that you were aware about the wanted for the violent

14 domestic assault; you were aware about the warrants.  Had you

15 been given any information about whether you should expect

16 that Mr. Wingo would be armed?

17 A    Yes.  We knew he had a -- a criminal history.  I can't

18 speak right now upon exactly if I knew everything he had been

19 arrested and/or charged for, but we -- as we do with any

20 fugitive we're investigating, we find out whether they're a

21 convicted felon, if they have been charged federally or not,

22 and we were also given information from the domestic violence

23 detective that Mr. Wingo was known to carry a .380 Ruger

24 pistol.

25 Q    Okay.  And so let me take that one at a time.  Based on

1  that, that investigation, did you find out that in fact

2  Mr. Wingo was a convicted felon?

3  A    Yes, we did.

4  Q    And did you know that he had a prior federal conviction?

5  A    We did, yes.

6  Q    And then did you receive any specific information relayed

7  to law enforcement by the victim of the domestic assault about

8  where he kept that weapon traditionally?

9  A    So the information we were given was from the detective

10  on behalf of --

11        MR. MORGAN:  Your Honor, at this time, I'm going to

12  object to hearsay.

13        THE COURT:  Do you have a response?

14        MS. ANDERSON:  What's pertinent here is the

15  information the officer had at the time he then made the

16  decisions he made about the search and the arrest.  Certainly,

17  as is often the case, he received this information from other

18  law enforcement officers, but this is what he was informed and

19  what he knew at the time he made his decisions at this

20  particular date.

21        THE COURT:  Okay.  Do you have a response?

22        MR. MORGAN:  Your Honor, his knowledge is based on

23  hearsay testimony from another police officer, not his

24  firsthand information, and so our objection still stands.

25        THE COURT:  All right.  All right.  I'm going to

1    overrule the objection.  The Rules of Evidence are not

2    strictly applied in a pretrial evidentiary hearing such as

3    this.

4            MR. MORGAN:  Yes, Your Honor.  Thank you.

5            THE COURT:  All right.  You may proceed.

6    Q    (By Ms. Anderson) So what information had been relayed to

7    you by Detective Norberg about where Mr. Wingo kept his gun?

8    A    It was told to us that he kept the gun either in the

9    sunglass holder of his pickup truck, the Chevy pickup truck,

10   or on his person, in his waistband.

11   Q    Okay.  All right.  So upon arriving at the scene on Melba

12   Avenue, can you describe for the Court what you then did?

13   A    Yes.  So when we all converged simultaneously to effect

14   the arrest, we ordered Edward out of the vehicle.  He was in

15   the driver's seat of the Chevy pickup truck.  At that time, he

16   complied immediately, put his hands up, and he was placed in

17   handcuffs and arrested.

18   Q    Okay.  And was he arrested there outside his truck?

19   A    Yes.  It's immediate.  As soon as we can get handcuffs

20   on, typically, we do it for the safety of everybody involved.

21   So it would have been right outside of the door there, of the

22   driver's door of the pickup truck.

23   Q    And where was that pickup truck parked?

24   A    It was parked in the driveway of the address on Melba.

25   Q    All right.  And at the time that Mr. Wingo exited the car

1  and was placed under arrest, did you detect anything that

2  might lead you to believe that there was further contraband in

3  the area?

4  A    Yes.  There was a -- the odor of marijuana coming from

5  inside the truck, the pickup truck.

6  Q    And was that something that you personally detected?

7  A    It was.

8  Q    Okay.  Do you know -- you testified that Mr. Wingo was

9  arrested, that he was placed in handcuffs.  Do you know if

10  there was a search done incident to that arrest?

11  A    Yes, a search of Mr. Wingo after he was --

12  Q    Of Mr. Wingo, yes.

13  A    Yes, after he was placed in handcuffs, correct.

14  Q    And what, if anything, was found during that search, to

15  your knowledge?

16  A    There was a bag of marijuana located in one of his pant

17  pockets, either the right or the left -- I don't remember

18  which one -- once he was searched incident to arrest by one of

19  our officers on our team.

20  Q    Okay.  And so you did not actually conduct that search

21  yourself?

22  A    Correct.

23  Q    So you subsequently just found out that they had found

24  marijuana on his person?

25  A    Correct.

1  Q    All right.  And were you the one -- upon smelling the

2  marijuana emanating from the vehicle, did you conduct the

3  search of the vehicle?

4  A    I did.

5  Q    And can you tell the Court about the search and what, if

6  anything, you found?

7  A    So there was a lot of -- there was a lot of things in the

8  car.  I remember there being tools and such in the back seat.

9  So we focused -- I focused primarily on the front driver's

10  side compartment, during which time I located a -- a

11  semiautomatic handgun in the fuse box area of the -- of the

12  pickup truck.

13  Q    And let me ask you; have you, in your law enforcement

14  career, had occasion to -- to search fuse boxes in the past?

15  A    Yes.

16  Q    In your experience, is there anything notable about

17  whether contraband is sometimes kept in the fuse box of a

18  vehicle?

19  A    Yes.  Typically, when searching a vehicle for drugs

20  specifically, they're hidden either in compartments that --

21  that noticeably pull out or push back in -- glove box, center

22  console, and often the fuse box or other pieces of plastic

23  that have plastic coverings where there's a void where you can

24  put narcotics.

25  Q    All right.  And did that gun that you retrieved from the

1  fuse box of Mr. Wingo's car -- was it a .380, as described by

2  his girlfriend, that he carried or kept in the truck?

3  A    It was.  Earlier, I believe I said we had information it

4  was a .380 Ruger.  I believe I misspoke there.  It was just --

5  we just had information it was a .380 pistol, so I want to

6  clarify that, and, yes, it was -- it was indeed a .380

7  semiautomatic pistol, and it was in fact a Ruger LCP.

8  Q    All right.  And subsequent to locating that weapon, did

9  you have an opportunity to conduct an interview with

10 Mr. Wingo?

11 A    I did.

12 Q    And prior to interviewing Mr. Wingo, did you administer

13 to him what's known as the *Miranda* rights?

14 A    I did.

15 Q    Okay.  Did Mr. Wingo give you any information about the

16 marijuana that you had smelled and that was found during the

17 search incident to arrest?

18 A    Yes.  He did -- he did claim possession of that and said

19 he had found it a night before at a nightclub.

20 Q    Okay.  And did Mr. Wingo give you any information about

21 whether in fact this residence -- let me just confirm; the

22 residence at which his truck was parked and where the arrest

23 occurred and where the search of the truck occurred -- was

24 that 4303 Melba Avenue, in St. Louis County?

25 A    Yes.

1  Q    And what, if anything, did Mr. Wingo tell you about that

2  address, and more specifically, did he tell you whether it was

3  his home or not?

4  A    So during the interview, Mr. Wingo told us that it was

5  being -- that specific residence was being renovated by him

6  and his uncle.  I believe his first name was Franklin.  He

7  said it was not being lived in at the time of the arrest, and

8  I cannot think of anything else that -- anything else about

9  the residence.

10 Q    So he told you during that interview that he was not

11 living at that address?

12 A    Correct.

13 Q    And nor was anyone else?

14 A    Correct.

15 Q    And that it was actually a home that was just being

16 renovated or construction work was being done at?

17 A    Correct.  He -- he told us it was being renovated and --

18 yeah.

19 Q    All right.  And did he tell you what he was doing in the

20 truck immediately prior to law enforcement arriving?

21 A    I don't recall.

22 Q    Okay.  And let me ask specifically; do you recall in the

23 interview him telling you whether or not he was sleeping in

24 his truck that morning when law enforcement arrived?

25 A    I do remember him telling us that he had been sleeping in

1  his truck.

2  Q    Okay.

3  A    During -- at some point during the interview, yes.

4  Q    All right.  And did you ask Mr. Wingo for consent to

5  enter that home at some point during the investigation?

6  A    Yes.

7  Q    And can you describe for the Court whether, based on your

8  observations, the residence looked like it was one that was

9  being actively lived in and occupied or whether it looked like

10 a home that was under construction renovation?

11 A    From my observations, it did look -- it was not

12 furnished.  I believe there was a table in the living room.

13 This is from memory.  There were some suitcases and some bags

14 in the living room area.  It did not appear that it was

15 occupied or being lived in at the time.  Correct.

16        MS. ANDERSON:  Okay.  Your Honor, may I have

17 permission to approach the witness?

18        THE COURT:  Yes.

19        MS. ANDERSON:  Thank you, Your Honor.

20 Q    (By Ms. Anderson) Officer Keener, I'm going to show you

21 two photographs that have been marked with stickers,

22 Government's Exhibit 1 and Government's Exhibit 2.  Can you

23 take the time you need to look at those and then let the Court

24 know whether you recognize what's depicted in those

25 photographs?

1   A    Yes, I do recognize them.

2   Q    And turning first to State's Exhibit 1, can you describe

3   for the Court what that's a photograph of?

4   A    Yes.  That is a photograph of Mr. Wingo's pickup truck in

5   the driveway of the Melba address that we've already

6   discussed, and that's the residence itself there in the

7   background.

8   Q    Okay.  And can you describe then the photograph that is

9   marked as Government's Exhibit 2?

10  A    Yes.  That is, specifically, the fuse box on the driver's

11  side of Mr. Wingo's truck where I located the pistol.

12          MS. ANDERSON:  Your Honor, the Government, at this

13  time, would move Government's Exhibits 1 and 2 into evidence

14  for the purposes of this hearing.

15          MR. MORGAN:  No objection, Your Honor.

16          THE COURT:  They'll be received.  Thank you.

17          MS. ANDERSON:  Thank you.  May I retrieve the

18  exhibits, Your Honor?

19          THE COURT:  Pardon me?

20          MS. ANDERSON:  May I retrieve the exhibits from the

21  witness?

22          THE COURT:  Yes.

23          MS. ANDERSON:  Thank you, Officer.

24          Thank you, Officer, and, Your Honor, I have no

25  further questions at this time.

1    THE COURT:  All right.  Mr. Morgan, you may inquire.

2    MR. MORGAN:  And, Your Honor, do you have a

3  preference as to whether I can actually pull my mask down?

4  Like Attorney Anderson, I have problems with talking and

5  breathing and the fogging of the glasses.  Is it okay since

6  I'm distanced from anybody to pull my mask down in order to be

7  clear?

8    THE COURT:  Actually, I'd prefer that you kept it up.

9    MR. MORGAN:  Yes, Your Honor.

10    THE COURT:  But you may take your time and allow -- I

11  have the same problem with eyeglasses.  They do fog.

12    MR. MORGAN:  Yes, Your Honor.

13    THE COURT:  So -- but I would prefer that you keep

14  your mask on.

15    MR. MORGAN:  Yes, Your Honor.  Thank you.

16    THE COURT:  All right.  Thank you.

17    MR. MORGAN:  May I proceed?

18    THE COURT:  Yes, sir.

19                    CROSS-EXAMINATION

20  BY MR. MORGAN:

21  Q    Okay.  Good morning, Officer Keener.  My name is Tyler

22  Morgan, and I represent Edward Wingo.  Before we get started,

23  it's my understanding that you had a late night, so I

24  appreciate you for coming in this hour this morning.  I just

25  have a series of questions that I want to ask you.  They're

1  going to be straightforward.  I don't plan to try to trip you

2  up or anything.  So I just wanted to thank you for coming and

3  jump into it.  So before we get started, you were not the

4  officer that wrote the report; correct?

5  A    Correct.

6  Q    That officer was Officer Jordan; correct?

7  A    Correct.

8  Q    Okay.  Did you review that report before coming in this

9  morning?

10  A    Yes, sir.

11  Q    Did you review your grand jury testimony as well?

12  A    I did not.

13  Q    You didn't.  Okay.  What, if anything else, did you

14  review in order to prepare for the hearing?

15  A    I reviewed the written narrative of the report, and I

16  reviewed the audio of our first interview.

17  Q    Okay.  So based on all of that, is it fair to say that

18  you have a working knowledge of everything that happened both

19  during and prior to the search?

20  A    Yes, sir.

21  Q    Okay.  So I want to talk about how you came to know about

22  Mr. Wingo.  So you advised that you were involved in assisting

23  with the arrest of Mr. Wingo on August 19th, 2019; correct?

24  A    Yes, sir.

25  Q    Did you have much, if any, knowledge of who Mr. Wingo was

1    prior?

2    A    None.

3    Q    You had never met him before?

4    A    Correct.

5    Q    You didn't personally know him to carry firearms or

6    anything of that nature, did you?

7    A    That is correct.

8    Q    Okay.  Now, you mentioned that -- that Mr. Wingo had

9    active warrants, I believe, for a felony wanted and two -- I

10   think a city and a county warrant separately?

11   A    Yes, sir.

12   Q    Okay.  Now, the details of who Mr. Wingo was and what he

13   was known to carry, where he was known to associate, all of

14   that came from -- is it Detective Norberg?

15   A    Yes, sir, that is correct.

16   Q    Okay.  And prior to the arrest, she gave you a picture of

17   Mr. Wingo; correct?

18   A    Yes.

19   Q    And did you share that with everybody in the task force?

20   A    Yeah.

21   Q    Okay.

22   A    Everybody involved in the arrest that day, yes.

23   Q    Right.  Right.  So everybody that was involved would have

24   known what he looked like prior; correct?

25   A    Yes, sir.

1  Q    Okay.  And you also mentioned that she gave you a photo

2  of the Chevy pickup truck, correct, or at least advised you

3  that he drove a 2000, I think, gray or silver Chevy pickup

4  truck?

5  A    We were notified of that.  I can't think now whether we

6  had a physical picture of it or an example photo, but we were

7  notified of the make and model and the year of it, yes, sir.

8  Q    Okay.  So when you saw the truck, you figured that was

9  the truck; correct?

10 A    The officer that did see it was the one that she actually

11 was the case officer for it, and she immediately recognized it

12 and him in the truck when she saw it, yes, sir.

13 Q    Okay.  And that was Officer Jordan; correct?

14 A    Correct.

15 Q    Okay.  And is it also true that Detective Norberg also

16 gave you his last known address?

17 A    I -- typically, we have all the addresses associated

18 with.  At this specific time, I can't think of what that would

19 have been --

20 Q    Okay.

21 A    -- or if we had --

22 Q    Well, is it fair to say that 4303 Melba was an address

23 that was known to have previously at least been used by

24 Mr. Wingo?

25 A    We knew that he was associated with that address.

1  Q    Okay.  So when you say "associated," just kind of explain

2  what you mean by that.

3  A    Anything from an arrest history or any police report or

4  any documentation of a crime occurrence, a business, a

5  residence, any of that, that would be an associated address --

6  Q    So -- so --

7  A    -- to be considered that.

8  Q    So being associated with an address could mean that you

9  live there or otherwise have some sort of property interest in

10  it?

11  A    That could, yes.

12  Q    Okay.  Okay.  Now, I believe that you mentioned that --

13  that you entered the house at one point.  We'll get to that

14  later, but you mentioned that there were suitcases and bags

15  inside the home; correct?

16  A    Yes, sir.  I don't -- I can't be specific.  I remember

17  the layout of the house, but I can't remember everything

18  specifically in the house.  I just remember that living room

19  area.

20  Q    Uh-huh.  Now, is it fair to say that in Mr. Wingo's

21  statement to you he advised that even though he didn't live in

22  that house he did keep items in the house?

23  A    He did tell us that, yes.

24  Q    Okay.  And did you -- he gave you consent to search the

25  house; correct?

1  A    Correct.

2  Q    Did you search the contents of those bags and suitcases

3  that you recall seeing that day?

4  A    No.  We -- it was a brief search.  I remember at least

5  one of the rooms being empty, completely empty of anything,

6  and it was just kind of just a real brief search.  It didn't

7  seem like there'd be anything we'd find, so we didn't -- I

8  don't remember going through anything specific.

9  Q    Okay, but -- okay.  But you took his consent to mean that

10  you could get into the house; correct?

11  A    Yes, sir.

12  Q    And you took him back to the house, and he had a key;

13  correct?

14  A    Yes, sir.

15  Q    He showed you which key to --

16  A    Yes.

17  Q    -- go into the house?

18  A    Correct.

19  Q    So is it fair to say that he had the access to come and

20  go as he pleased?

21  A    Yes, that would be fair.

22  Q    Okay.  Okay.  Now, in addition to all of the previous

23  information that Detective Norberg advised your team of, she

24  also advised you that he was known to carry a handgun either

25  in -- I think you said it was either in his waistband or in

1  the sunglasses holder of his truck; correct?

2  A    Correct.

3  Q    Okay.  And to your knowledge, she received that

4  information from the victim of the alleged domestic assault

5  some days prior to that?

6  A    To our knowledge, yes, that is correct.

7  Q    Okay.  Did you, at any point, review the arrest report or

8  the report of the domestic assault?

9  A    Typically, we read as many reports as we can before --

10  during our investigation of any fugitive, before any fugitive

11  apprehension.  I can't recall if I read that report or not.

12  Q    Okay.  Well, I guess to be specific, to your

13  recollection, do you recall there being any evidence or

14  suggestion that a firearm was used to effect that alleged

15  domestic assault 2nd?

16  A    I don't -- I don't recall.  Again, I don't remember if I

17  read that report or not.

18  Q    So would you have any reason to disagree with me if I

19  told you that a gun was not determined to be found?

20        MS. ANDERSON:  Your Honor, I just would object.  I

21  think it's argumentative to ask a witness, "Do you have any

22  reason to disagree?"  He's indicated he doesn't even recall if

23  he ever read the report and that he doesn't know.

24        MR. MORGAN:  Just to respond, Your Honor, if he

25  doesn't know, he can say he doesn't know.

1    THE COURT:  Right.

2    MR. MORGAN:  So I don't believe that that question is

3  argumentative.  I'm just trying to get to the bottom of it

4  just to get his recollection of what he knew prior to the

5  search.

6    THE COURT:  Okay.  Why don't you ask him if he

7  remembered --

8    MR. MORGAN:  Okay.

9    THE COURT:  -- what it was.

10  Q    (By Mr. Morgan) So to rephrase, do you remember there

11  being any information about whether or not a gun was used

12  during the course of the alleged domestic assault?

13  A    I do not remember.

14  Q    Okay.  But outside of the fact that Detective Norberg

15  told you that the victim told her or him -- I'm sorry.  Is

16  Detective Norberg a man or a woman?

17  A    It's a female.

18  Q    A woman.  Okay.  So -- so outside of the fact that

19  Detective Norberg told you that the victim told her that he

20  was known to carry firearms, you didn't have any knowledge or

21  firsthand knowledge of the fact that he carried firearms, did

22  you?

23  A    We had done a criminal history report.  I don't know.

24  I'm confused on what you're asking.

25  Q    I'm sorry.

1   A    That specific -- that specific knowledge or --

2   Q    So I guess to clarify, because I know the question was

3   kind of convoluted, to clarify, you didn't have any firsthand

4   knowledge that he would or would not have a firearm on his

5   person, did you?

6   A    Typically, criminal history reports can indicate certain

7   things.  Again, I'm confused on the question.  We -- we --

8   Q    The information or the knowledge that he was known to

9   carry firearms was secondhand information; correct?  I think

10  that's what I'm trying to get to.

11  A    Yes.  I had no -- yes, I had no --

12  Q    Okay.

13  A    I had never met Mr. Wingo, and I had no knowledge of him,

14  specifically, of him having guns.

15  Q    Right.  Now, you mentioned that you reviewed his

16  interview with you; correct?

17  A    Yes, sir.

18  Q    Do you recall in that interview asking him about a long

19  gun that he was alleged to keep in that house as well?

20  A    Yes.

21  Q    Did you find a long gun when you searched the Melba

22  address?

23  A    I did not.

24  Q    Okay.  And is that something that Detective Norberg

25  advised you of as well?

1   A    No.

2   Q    So how did you come to know that he possibly kept a long

3   gun inside of the Melba address?

4   A    Just -- just the interview.

5   Q    Oh, just in the interview.  Okay.  But he didn't have

6   one; correct?

7   A    There was not a long -- there was not any weapons or

8   contraband found inside the Melba address.

9   Q    Okay.  Okay.  Now, there were -- so the officers involved

10  in the operation -- just to be clear, that was Officers

11  Jordan, Zufall, Klein, O'Fallon, Moritz, and Baumhardt?

12  A    One more time.  I'm sorry.  I think there's one you left

13  out.

14  Q    I'm sorry.  And if I left it out, please clarify for me,

15  but per the report, I believe it was Officers Jordan, Zufall,

16  Klein, O'Fallon, Moritz, and Baumhardt, and including

17  yourself.

18  A    Yes, and there was a sergeant also there.

19  Q    Okay.  And what was the name of the sergeant?

20  A    Warner.

21  Q    Warner.  Okay.  So I think, including you and, I guess,

22  now that Sergeant Warner was also present, there were

23  approximately eight officers involved?

24  A    The names you read are -- and, again, I'm trying to just

25  count on my fingers here.  I believe those were all the people

1   that were there, involved in the arrest, and the sergeant that

2   I mentioned.

3   Q    Okay.  But Mr. Wingo was the only person on scene when

4   you all arrived; correct?

5   A    Correct.

6   Q    Okay.  And he was the only one in his truck?

7   A    That is correct.

8   Q    Okay.  Now, I believe you advised -- and per the report,

9   Officer Jordan was the first person to arrive and identify

10  Mr. Wingo?

11  A    Yes.

12  Q    Okay.  And then she waited until the remaining officers

13  converged on the scene?

14  A    Yes.

15  Q    Okay.  So she drove by, and she waited.  Did you all meet

16  up there first, or did everybody just converge on the house at

17  the same time?

18  A    We just -- we were all ready.  You know, our office is

19  close by, and we just all came, came together there at the

20  truck.

21  Q    Okay.  And just to be clear, before we get into the

22  search itself, you had arrest warrants for Mr. Wingo; correct?

23  Correct?

24  A    I'm confused.

25  Q    You had arrest warrants for Mr. Wingo, which is why you

1    were attempting to arrest him; correct?

2    A    So there was the wanted for questioning, which is a

3    wanted for questioning --

4    Q    Right.

5    A    -- not a warrant, and then he had two other warrants for

6    his arrest.

7    Q    So you did have arrest warrants, and then you also had

8    the felony wanted; correct?

9    A    Are you asking if I had a physical piece of paper in my

10   hand?

11   Q    Not necessarily, but just there was probable cause to

12   arrest Mr. Wingo; correct?

13   A    Yes.

14   Q    Okay.  But you didn't have a search warrant to search the

15   house or the vehicle, did you?

16   A    We did not.

17   Q    Okay.  Okay.  Now, you said that once all officers

18   arrived, you all converged on the house; correct?

19   A    On the truck.

20   Q    On the truck.  I'm sorry.  But that's correct?

21   A    Yes.

22        MR. MORGAN:  Okay.  Your Honor, showing opposing

23   counsel what we have premarked as Defense Exhibits 1 through

24   5, I believe that Exhibits 2 and 3 are a duplicate of

25   Government's 1 and 2.  May I approach the witness, Your Honor?

1    THE COURT:  Yes.  And I just want the record also to

2  reflect I did not see her at the beginning.  Assistant Federal

3  Public Defender Felicia Jones is present.

4    MS. JONES:  Right here.

5    THE COURT:  And I didn't see her with the monitor

6  blocking my view.

7    MS. JONES:  I -- I won't be speaking, Your Honor.

8    THE COURT:  No.  I understand.

9    MR. MORGAN:  Your Honor, would you like a copy as

10 well?

11   THE COURT:  Eventually, I'll get them, but I'll just

12 listen to --

13   MR. MORGAN:  Yes, Your Honor.

14   THE COURT:  -- you at this time, or if you want to

15 put it on the ELMO there, then I can see it on the screen at

16 the same time.

17 Q   (By Mr. Morgan) Okay.  But -- okay.  So, Officer Keener,

18 you're aware of what Defense Exhibits 1 through 5 are;

19 correct?

20 A   I'm spreading them out here.

21 Q   No problem.  Take your time.

22 A   Yes.

23 Q   Okay.  So is it fair to say Defense Exhibits 1 and 2 are

24 both similar but slightly different angles of the fuse box?

25 A   One of them looks the same, but it's the same fuse box in

1   the same truck.

2   Q    Right.

3   A    Yeah.

4   Q    So I mean it's the same; I guess the content of the photo

5   is the same, but it's a slightly different angle?

6   A    Oh, yes, sir.  I see what you're saying.  Yes.

7   Q    Okay.  Defense Exhibit 3 is a photo of the truck;

8   correct?

9   A    Yes, sir.

10  Q    Defense -- Defendant's Exhibit 4 is the copy of the

11  identifying information of the truck; I believe that's the VIN

12  number and just other identifying information?

13  A    Yes, sir.

14  Q    Okay.  And then Defendant's Exhibit 5 is a picture of the

15  back of the vehicle, and it shows the color of the vehicle

16  being silver, the make of the vehicle being a Chevrolet, and

17  then the license plate; is that correct?

18  A    Yes, sir.

19  Q    And are all of these photos fair and accurate depictions

20  of the truck as you saw it on that particular day?

21  A    Yes, sir.

22       MR. MORGAN:  Okay.  Your Honor, at this time, I'd

23  like to admit Defendant's Exhibits 1 through 5 in evidence.

24       MS. ANDERSON:  No objection, Your Honor.  Thank you.

25       THE COURT:  They'll be received.

1       MR. MORGAN:  Okay.  Thank you, Judge.

2       THE COURT:  All right.

3   Q   (By Mr. Morgan) Now, the truck was not in the garage;

4   correct?  It was parked in the driveway?

5   A   Yes, sir.

6   Q   Okay.  About how far up or down the driveway was it

7   parked?

8   A   It was parked -- on 3, you can see it.  That's -- it

9   wasn't moved.  It was right there.

10  Q   All right.  So it was pretty much at the very top of the

11  driveway before you actually enter the garage?

12  A   It was where it is in 3.

13  Q   Right, which is right outside of the garage; correct?

14  A   It's on the -- yeah, I mean it's -- it's on the driveway

15  between the garage and the road.

16  Q   Okay.  Now, when officers converged on the scene,

17  Mr. Wingo was ordered out of the vehicle; correct?

18  A   Yes.

19  Q   And he was complying, wasn't he?

20  A   He was.

21  Q   Okay.  Now, initially, I wasn't sure, but I believe in

22  your direct, you testified that Officer Moritz was the officer

23  that pat Mr. Wingo down?

24  A   He was the one that searched him incident to the arrest,

25  yes.

1    Q    Right.  And as a result of that search -- is it fair

2    because you had prior knowledge that he may carry a gun in the

3    waistband that his waistband was checked for a firearm?

4    A    He was searched incident to arrest.

5    Q    But no firearm was recovered on his person; correct?

6    A    There was no firearm recovered from him.

7    Q    Now, you mentioned that -- that a small quantity of

8    marijuana was found; correct?

9    A    Yes.

10   Q    Do you recall how much or the size of it?

11   A    It was a single bag of -- I don't remember the size.  I'd

12   be guessing if -- if I -- if I --

13   Q    Well, eyeballing it, can you say it was one gram, two

14   grams, three grams, kind of --

15   A    It was probably less than five grams.

16   Q    Less than five grams?

17   A    Five grams or less.  Again, that's just me.  That's just

18   speculation.  I didn't weigh it.

19   Q    No, that's fine.  I just wanted to get your perception of

20   how much weed -- marijuana there was.  Now, you mentioned a

21   strong odor of marijuana.  Was that odor -- did it come off as

22   burnt or fresh marijuana?

23   A    It just -- I just smelled marijuana.

24   Q    So I mean do you know the distinction between fresh

25   marijuana and burnt marijuana?

1   A    I -- again, I -- typically, when it's marijuana, I

2   just -- I say marijuana because I don't know whether it's

3   burnt or not.  I don't want to speculate.  You know, it was

4   just marijuana.

5   Q   So you just smelled marijuana; you can't really determine

6   whether or recall whether it was burnt or fresh?

7   A    Correct.

8   Q   Okay.  Did you find any evidence outside of the marijuana

9   on his person that there was any marijuana being smoked

10   through maybe ashes or a marijuana cigarette or anything else

11   in the vehicle?

12   A    No.

13   Q   Okay.  And did Mr. Wingo appear to be under the influence

14   of anything?

15   A    Not that I recall.

16   Q   Okay.  Now, once he was searched incident to an arrest,

17   where did Mr. Wingo go from that point?

18   A    He remained -- if I remember correctly, he was searched

19   near the -- near the back of the truck, near the patrol car,

20   where the truck and the patrol car meet on one of the

21   photographs there you see, and then I don't remember.

22   Usually, we put the -- the arrested in a -- in one of the

23   patrol cars for transport.

24   Q   Okay.  So once he was searched, he was placed in the

25   patrol car?

1   A    At some point, he was.  I don't remember if it was right

2   away or not.  I -- again --

3   Q    Well, is it fair to say that once he was arrested and in

4   the custody of multiple officers the scene was secure?

5   A    Yeah, once he was in handcuffs and away from the truck, I

6   would say that.

7   Q    Now, I believe you testified that you were the person

8   that found the gun; correct?

9   A    I was.

10  Q    Did you -- how many officers participated in the search

11  of the truck?

12  A    There were several.  I don't remember who all was --

13  Q    Uh-huh.

14  A    -- involved in the search.

15  Q    Okay.  But you can at least say there were two, three,

16  four?

17  A    There was probably, including myself, three to four.

18  Q    Okay.  And do you recall how long the search of the truck

19  took?

20  A    No, I don't.

21  Q    Can you estimate?  Maybe five minutes, 10 minutes, 20

22  minutes?

23  A    Again, I don't -- you know, five to 10 minutes.  I don't

24  want to guess because I don't remember.

25  Q    Okay.  Now, you mentioned that there was a lot in the

1  back of the truck.  I believe you said that there were tools,

2  among other things, in the back; correct?

3  A    Yes, sir.  I actually was referring to the -- to the back

4  of the cab area at that time.

5  Q    The back of the cab or in the bed?

6  A    There was -- there was stuff -- I was referring to the

7  back of the cab earlier, but there was stuff in the bed also.

8  Q    Okay.  And was that searched as well?

9  A    I -- I don't remember.

10 Q    Okay.

11 A    I'm sure we went through it if it looked like there could

12 be marijuana, or I don't know.  I don't remember.

13 Q    Okay.  So when you -- when you found the gun in the fuse

14 box, was that the first place that you searched?  Did you

15 search underneath the seat first, go to the -- and I know that

16 you've testified that he was known to carry the gun also in

17 the sunglasses holder.  Is that a place that you searched as

18 well?

19 A    We started searching just like we would for any other

20 narcotic, like marijuana search.  Anywhere we thought there

21 could be marijuana is where I remember we started searching.

22 Q    Right.  And so I guess the question that I'm asking is at

23 what point did you say, "Hey, let me check the fuse box"?

24 A    I focused my attention -- usually, I work from where

25 the -- where the passengers or occupants of the vehicle are

1   out --

2   Q    Okay.

3   A    -- if I'm looking for specific contraband, and in this

4   case, it was marijuana.  So I typically start -- I've started

5   in the -- in the driver's compartment, and I check, you know,

6   like I said, little drawers, crevices, places where there

7   could be, and that's often a place -- or a lot of times, like

8   the center console pops out or little pieces of plastic pop

9   out.  I always check all that stuff.

10  Q    Okay.

11  A    So that's -- that's when I would have checked the fuse

12  box.

13  Q    Okay.  So I believe you said you work from the inside

14  out.  So it is kind of like you start in the center console,

15  maybe check the dash, glove box, and then come outside towards

16  the -- I guess the seats of the vehicle, the sides, if there

17  is any compartments on the door?  Is that what you mean when

18  you say you work from inside out?

19  A    I think I meant I work from where the occupants are.  You

20  know, so if there was -- if we've arrested somebody, for

21  example, and there was only one person in the car and, for

22  some reason, they were in the passenger's seat of the car and

23  we're searching the car for marijuana, I'd focus on the front

24  passenger's seat first and I'd work away from that area.  Does

25  that make sense?

1    Q    Okay.  The front.  So when you say the front passenger's

2    seat, do you mean on the other side of the truck or do you

3    mean the passenger compartment as a whole?

4    A    I was just using that as an example.

5    Q    Okay.  I get what you mean.

6    A    So if there's somebody located -- if it's a six-car --

7    you know, six-seat vehicle and it's -- and the person -- you

8    know, there's only one person in the car and they're in the

9    very back of the car, I'm going to focus -- if we're looking

10   for marijuana, because of that, I'm going to focus on that

11   area.  So since he was the only person in the car and we were

12   looking for marijuana, I focused on the front driver's side

13   seat compartment first.

14   Q    Okay.  And did you estimate the search was about five to

15   10 minutes?  Is that what you said earlier?

16   A    Really, I don't recall.  I mean I'm guessing.  I don't

17   recall.

18   Q    Okay.  Now -- one moment, Your Honor.

19        Okay.  And just to backtrack a little bit, is it fair to

20   say that Mr. Wingo was secure at the time that you started the

21   search?

22   A    He was in handcuffs.

23   Q    Okay.  And you said that he was searched behind the

24   truck; correct?

25   A    He was searched somewhere.  Again, I'm trying to be as

1  specific as I can.  I don't specifically recall because I

2  wasn't the one searching him.  Typically, what we do is we put

3  handcuffs on right away.  So for the safety of everybody, we

4  remove them from that area of the truck or of the vehicle

5  involved, and we move them back toward the back and away from

6  the vehicle.

7  Q    And so when he was being searched, about how many

8  officers were present?  I guess at least as far as taking care

9  of Mr. Wingo.  Do you recall?

10 A    No.  I don't recall where I specifically was when he was

11 being searched.

12 Q    Do you recall the locations of every other officer when

13 he was searched?

14 A    No, I really don't.

15 Q    But, again, it was a pretty secure scene.  I think you

16 said about seven or eight officers, and it was just Mr. Wingo?

17 A    Yes.

18 Q    Okay.  And I believe you mentioned Sergeant Warner; is

19 that who you said was involved?

20 A    Correct.

21 Q    Now, the report doesn't say that Mr. Warner, Sergeant

22 Warner, was present.  Are you sure that he was present at the

23 scene, or was it later when he was being interviewed?

24 A    I believe he was there.

25 Q    Okay.  But do you know for certain that he was there?

1   A    I remember him being there.

2   Q    Okay.

3   A    It's not on body cam, unfortunately.

4   Q    Okay.  One moment, Your Honor.

5        Just a couple more questions, Mr. Keener.  So is it fair

6   to say that -- well, I'm not going to ask you is it fair to

7   say, but when you were searching the vehicle, were you looking

8   for marijuana or the gun that you were advised that he was

9   known to carry?

10  A    We were looking for marijuana.

11  Q    Okay.  So is your testimony that you weren't looking for

12  a gun and you just found it?

13  A    We were looking for marijuana, but we --

14  Q    But not the gun?  I'm just trying to clarify.

15  A    -- but not the gun.  We weren't looking for a gun.  We

16  were looking for marijuana.

17  Q    Okay.

18  A    I mean we knew that he was a convicted felon --

19  Q    Right.

20  A    -- and we knew he was known to carry a gun, but we were

21  searching for marijuana.

22  Q    Okay.  And just to be clear, at the time of the arrest

23  and the search, the scene was completely secure; correct?

24  A    One more time.

25  Q    So at the time of the arrest and the search, the scene

1  was completely secure; is that fair to say?  The truck

2  couldn't be moved, he was in cuffs, and he had no access to

3  the vehicle; is that fair to say?

4  A    When we began searching, he was in handcuffs.

5  Q    Okay.  And he was away from the vehicle?  I believe that

6  was your testimony.

7  A    And when we -- when we began searching, I believe he was

8  at the back of his pickup truck.  I believe he was at the back

9  of his pickup truck.

10  Q    Okay.  Secure in handcuffs and in police custody?

11  A    In handcuffs and police custody.

12         MR. MORGAN:  Okay.  Your Honor, I believe those are

13  all the questions that I have.

14         THE COURT:  All right.  Thank you.

15         MR. MORGAN:  Did I give you a copy of these?

16         MS. ANDERSON:  You did, yes.  Thank you.

17         MR. MORGAN:  Okay.

18         THE COURT:  Redirect?

19         MS. ANDERSON:  Your Honor, no redirect.  Thank you,

20  though.

21         THE COURT:  All right.  You may step down.  Thank

22  you.

23         THE WITNESS:  Thank you.

24         THE COURT:  Do you have another witness,

25  Ms. Anderson?

1          MS. ANDERSON:  No, Your Honor.  The Government would

2     conclude its presentation of evidence.

3          I do, of course, have the two exhibits which I'm

4     happy to give the Court at any time the Court is ready for

5     them.

6          THE COURT:  All right.  Well, before we depart the

7     courtroom, for sure, I want you to give the deputy clerk the

8     exhibits so that they can be properly recorded and on behalf

9     of the defense as well.

10         MR. MORGAN:  Again, our 2 and 3 is a duplicate of

11    their 1 and 2.

12         DEPUTY CLERK:  All right.  I'll scan them.

13         THE COURT:  Okay.  All right.  Mr. Morgan, does the

14    defense have information or evidence to offer?

15         MR. MORGAN:  Nothing further, Your Honor.

16         THE COURT:  Anyone wish to make any argument?

17         MR. MORGAN:  I believe --

18         THE COURT:  I'll just say that I think both sides

19    provided the Court with detailed argument in the motion and

20    the supporting memorandum and in the Government's response.  I

21    don't know that there was a reply.  I don't think I saw a

22    reply, but if you wish to make some concluding remarks, then I

23    will allow you to do that.

24         MR. MORGAN:  Your Honor, I don't believe I have any

25    concluding remarks.  I would just ask the opportunity to

1   supplement our argument via brief.

2          THE COURT:  Okay.  How much time do you want?

3          MS. JONES:  We'll need to request the transcript.

4          MR. MORGAN:  Yes, we'll need to request the

5   transcript, so I will say at least 21 days.

6          THE COURT:  That's a long time.  How about two weeks?

7          MR. MORGAN:  Two weeks.  That will work, Your Honor.

8          THE COURT:  Two weeks after the transcript is filed.

9          MR. MORGAN:  Yes, Your Honor.  Oh, yeah, so two weeks

10  after the transcript is filed is fine.  Yes, Your Honor.

11         THE COURT:  Okay.  All right.  And how much time do

12  you want after the defense?

13         MS. ANDERSON:  Your Honor, I believe that if the

14  Court is comfortable with five days, I think that would be

15  adequate for the Government.

16         THE COURT:  I'll give you a calendar week.

17         MS. ANDERSON:  Thank you, Your Honor.

18         THE COURT:  All right.  Thank you, all, very much.

19  Court will be in recess.

20         MR. MORGAN:  Thank you, Your Honor.

21         MS. ANDERSON:  Thank you, Your Honor.

22         THE COURT:  You're welcome.

23      (Proceedings concluded at 9:42 a.m.)

24

25

<u>CERTIFICATE</u>

       I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

       I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

       I further certify that this transcript contains pages 1 through 41 inclusive.

       Dated at St. Louis, Missouri, this 23rd day of October, 2020.

*/s/ Gayle D. Madden*

_____

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter