THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:19-CR-806-SNLJ-DDN |
| ) | |
| EDWARD WINGO, JR. ) | |
| ) | |
| Defendant. ) | |

**OBJECTIONS TO THE UNITED STATES MAGISTRATE JUDGE'S**
**ORDER AND RECOMMENDATION**

Mr. Wingo, through his attorney, Assistant Federal Public Defender Tyler

Morgan, objects as follows to the Magistrate Judge's January 15, 2021, Order and

Recommendation.

**I. The Order and Recommendation drew clearly erroneous conclusions of
law.**

The Order and Recommendation correctly stated that—for Fourth Amendment

purposes—the curtilage around Mr. Wingo's home is part of the home itself.[1] The

Order and Recommendation also correctly stated that "curtilage" is defined as the

area "immediately surrounding and associated with the home."[2] Nevertheless, the

Order found that Mr. Wingo's truck was outside the curtilage because there was no

---

[1] Order and Recommendation, Doc. No. 47 at 8 (quoting *United States v. Bennett*, 972 F.3d 966, 971 (8th Cir. 2020)) ("The Fourth Amendment's protections extend to the curtilage surrounding a home… and therefore has been considered part of the home itself.").
[2] *Id.* at 9 (quoting *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (quoting *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013)) ("Curtilage is a place, which is 'immediately surrounding and associated with the home,' and is 'part of the home for Fourth Amendment purposes.'").

"protective wall or other physical barrier," and because the area "was in full view of any member of the public situated on the street."[3]

So long as it is curtilage, a parking patio that is visible from the street has as much protection from a warrantless search as a fully enclosed garage.[4] There is no "physical barrier" or "visibility" requirement in curtilage jurisprudence. The former requirement comes from the fact pattern in *Collins*. There is nothing in that opinion to suggest that the Court intended to delimit curtilage to *Collins*'s facts. The latter requirement depends on the constitutional significance of visibility, which is next to nothing. The Court in *Collins* called such a notion "mistaken," noting that visual intrusion from a lawful place is totally acceptable, while physical intrusion is not.[5] As Counsel noted in his Supplemental Memorandum, "even if an officer sees illegal drugs through the window of a house, assuming no other exception applies, the officer cannot seize it without a warrant."[6]

---

[3] *Id.* at 9-10 ("The undersigned concludes that the place where defendant Wingo's truck was parked was not within the curtilage of the house. The photo shows no protective wall or other physical barrier to protect any privacy in the area… That area was in front of, although adjacent to, and not behind (as was the location in *Collins*) the front perimeter of the residence. It was on a driveway, one car-width wide, that was a walkway available to anyone for walking to the front door of the residence. It was an area that was in full view of any member of the public situated on the street and was not an area "to which extends the intimate activity associated with the sanctity of a home and the privacies of life." (citations omitted)).

[4] *Collins*, 138 S. Ct. at 1675.

[5] *See id.* ("Virginia's proposed rule rests on a mistaken premise about the constitutional significance of visibility. The ability to observe inside curtilage from a lawful vantage point is not the same as the right to enter curtilage without a warrant for the purpose of conducting a search to obtain information not otherwise accessible." (citing *California v. Ciraolo*, 106 S. Ct 1809, 1813 (1986))).

[6] Doc. No. 45 at 2 (quoting *Collins*, 138 S. Ct. at 1670).

The Order implies that the driveway's function as a point of access to the front door is relevant to the curtilage question.[7] The driveway is so skinny that if one car were parked on it, access would be denied. However, even if the driveway were an access point, that is not relevant to the Fourth Amendment. Walkways exist for ingress only.[8] This implied license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer), leave.[9] There is no customary invitation to explore the front path with a metal detector,[10] or more to the point, rummage through Mr. Wingo's pickup. The bounds of the implied license created by a walkway do not require fine-grained legal knowledge to discern: if the Nation's Girl Scouts can do it, so can we.[11]

In his Supplemental Memorandum, Mr. Wingo correctly analogized curtilage protections to a "bubble," a kind of force field surrounding the home that can only be penetrated by a pair of eyes, a solicitor, or a warrant.[12] Indeed, in every description of the curtilage, what the Supreme Court has described is a "bubble." At the Fourth Amendment's "very core" is the right for a man to retreat into his own home, and there be free from unreasonable governmental intrusion.[13] This right would be of

---

[7] Doc. No. 47 at 10 ("[Mr. Wingo's truck] was on a driveway, one car-width wide, that was a walkway available to anyone for walking to the front door of the residence… Thus, the undersigned concludes that that area where defendant Wingo's pickup truck was parked… was not within the curtilage.").
[8] *Jardines*, 133 S. Ct. at 1415.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] Doc. No. 45, at 1 (citing *Jardines*, 133 S. Ct. at 1414-15) ("The Fourth Amendment draws a sharply circumscribed bubble around the home and the curtilage.").
[13] *Collins*, 138 S. Ct. at 1670 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

little practical value if the police could stand on a home's porch or side garden and trawl for evidence with impunity.[14] The right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window.[15] To give that right full practical effect, the curtilage includes "the area immediately surrounding and associated with the home."[16]

The Order seeks to carve out a "Mr. Wingo's driveway" exception to the Fourth Amendment based on the absence of barriers, the driveway's visibility, and the driveway's function as a walkway. Such carveouts to curtilage protections are not only frowned upon, but wrong.[17]

Finally, that the residence is humble is of no significance. "The most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion."[18] Physical barriers, visibility, and implied license are not relevant to whether police may pop the bubble.

## II. The Order and Recommendation made clearly erroneous application of law.

The Order and Recommendation found that the "pickup truck was parked immediately in front of the garage door."[19] Nevertheless, the Order found that Mr.

---

[14] *Jardines*, 133 S. Ct. at 1414.
[15] *Id.*
[16] *Collins*, 138 S. Ct. at 1670; *See also Ciraolo*, 106 S. Ct. at 1813 (holding that an aerial curtilage search from a lawful vantage point "is precisely what a judicial officer needs to provide a basis for a warrant.").
[17] *Id.* at 1675 ("Creating a carveout to the general rule that curtilage receives Fourth Amendment protection, such that certain types of curtilage would receive Fourth Amendment protection only for some purposes but not for others, seems far more likely to create confusion than does uniform application of the Court's doctrine.").
[18] *Id.* (quoting *United States v. Ross*, 102 S. Ct. 2157, 2171 (1982)).
[19] Doc. No. 47 at 2.

Wingo's truck sat outside the curtilage of 4303 Melba, based on its analysis of the facts and its statement of applicable law.[20] This conclusion is not supported by the photo that was admitted into evidence. The photo from the suppression hearing that was marked as State Exhibit 1 and Defense Exhibit 1 follows. It shows Mr. Wingo's truck in the driveway of 4303 Melba Ave. in St. Louis, immediately after the arrest.



---

[20] Doc. No. 47 at 10 ("Thus, the undersigned concludes that the area where defendant Wingo's pickup truck was parked and where the officers encountered defendant was not within the curtilage of the residence at 4303 Melba for purposes of the Fourth Amendment.").

Had the driveway been partially enclosed, the Order most assuredly would have found that the truck was within the curtilage and that the facts of *Collins* were satisfied. As it stands, Mr. Wingo's truck was parked as close as he could get to the garage door without hitting it. His truck was a 2000 Chevy 1500 extended cab pickup. Its length from front to back was more than 227 inches, not including the rear bumper.[21]

Mr. Wingo parked a big truck in the driveway of a small home. The Order and Recommendation found that his truck was not in the curtilage because, even though Mr. Wingo had retreated as far as he could, it wasn't far enough.[22] Such a finding is contrary to the principle set forth in *Collins* that the "most frail cottage" is entitled to the same privacy expectation as the "most majestic mansion."[23] If a man retreats into his curtilage as far as he can, his curtilage protects him. It is no less "curtilage" because he cannot afford a partially enclosed driveway.

Mr. Wingo made an effort to retreat as far as he could into the curtilage in order to get some sleep. He parked his truck as close as he could to the exterior of the home. The truck is practically under the eaves of the house. It is closer to the exterior of the house than the edge of the front porch. It should be apparent from the photographs that Mr. Wingo's truck was in the "area surrounding the home." The "front porch, side garden, [and] area 'outside the front window'" are in the curtilage,

---

[21] CARSDIRECT, *2000 Chevrolet Silverado 1500 Specs & Safety: Dimensions and Capacities*, https://www.carsdirect.com/2000/chevrolet/silverado-1500/specs.
[22] *See* n.20, *supra.*
[23] *Collins*, 138 S. Ct. at 1675.

as are enclosed driveways.[24] It would not be consistent to hold that standing with

one's nose against the garage door is outside that bubble.

### III. The Order and Recommendation made a clearly erroneous credibility finding.

The Order made a summary footnote conclusion that Officer Keener's

testimony about the smell of marijuana was credible.[25] Mr. Wingo objects to several

underlying factual determinations that have been mischaracterized by the Order, as

well as the Order's overall conclusion.

The Eighth Circuit has held that the mere smell of marijuana can establish

probable cause for a vehicle search under the automobile exception.[26] However,

testimony about the smell of marijuana must be credible before that search is

upheld.[27] When it comes to smelling marijuana, careful credibility determinations

are the *only* guard against intrusive vehicle searches and unverifiable subjective

sense impressions. A court's credibility findings should be dealt with carefully—with

close and exacting scrutiny—and summary conclusions should be avoided.

As Counsel noted in his Supplemental Memorandum, many factors play into

an officer's credibility. Credibility may be based on training in the detection of

---

[24] *Id.* at 1671.

[25] Doc. No. 47 at 3 n.2 ("The undersigned credits Officer Keener's testimony that he smelled the odor of marijuana emanating from the truck cab when defendant got out of the truck, because he was then a very experienced law enforcement officer, marijuana was found on [Mr. Wingo's] person after he alighted from the truck, in a post-arrest statement [Mr.] Wingo admitted possessing marijuana that morning (Doc. 44 at 12), and Officer Keener testified that, when the officers entered the truck to search it, they were focusing on finding marijuana (Doc. 44 at 34-39).").

[26] *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020); *United States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011).

[27] *United States v. Smith*, 789 F.3d 923, 929 (8th Cir. 2015).

controlled substances, including the odor of both raw and burnt marijuana.[28] On the other hand, an officer's failure to mention the smell of marijuana to other officers and a delay between the smell and the vehicle search points towards incredible testimony.[29]

The Order mischaracterized and gave improper weight to several facts. First, the Order erred when it used Mr. Wingo's post-search statement as a justification for the prior automobile search.[30] Because Mr. Wingo made this statement *after* the search occurred,[31] it is simply not relevant to whether a prior vehicle search under the automobile exception was justified.

Second, the Order erroneously stated that, during the interview, "Wingo admitted to then using marijuana."[32] This finding is directly contradicted by the record: Mr. Wingo never admitted to "then using" marijuana. He only admitted to

---

[28] *United States v. Smith*, 789 F.3d 923, 929 (8th Cir. 2015) (Officer testimony was credible when officer smelled marijuana, and was trained in the detection of controlled substances, including the odor of both raw and burned marijuana.); *United States v. Whitley*, No. 15-00059-01-CR-W-DGK, 2015 WL 4877545 at *4 (W.D. Mo. Aug. 14, 2015) (denying motion to suppress when, inter alia, both officers testified that they were familiar with the smell of marijuana).

[29] *United States v. Dolson*, 673 F. Supp. 842, 858-59 (D. Minn. 2009) (In finding that officer's testimony was not credible, the court reasoned that "if Trooper Engum had in fact smelled a strong odor of burnt marijuana before placing that call, it seems logical to expect that Trooper Engum would have mentioned his findings and his intent to call for a canine unit to the members of the Task Force, because such findings would likely "pertain to" the Task Force's ongoing investigation.").

[30] *See* n.35, supra.

[31] Doc. No. 44 at 12 (Counsel: "All right. And *subsequent to locating that weapon*, did you have an opportunity to conduct an interview with Mr. Wingo?" Keener: "I did." Counsel: "Okay. Did Mr. Wingo give you any information about the marijuana that you had smelled and that was found during the search incident to arrest?" Keener: "Yes. He did -- he did claim possession of that and said he had found it a night before at a nightclub." (emphasis added)).

[32] Doc. No. 47 at 4 ("After the handgun was found, Officer Keener interviewed Wingo… Wingo admitted to then using marijuana.").

possession, and that he had found the marijuana at a nightclub.[33] The police found

no evidence of the use of marijuana, other than the baggie in his pocket.[34]

The Order based its credibility determination on, *inter alia*, Officer Keener's

"experience."[35] Yet this very same experience means that Officer Keener has a

working knowledge of the law. Officer Keener knew that Mr. Wingo was a convicted

felon, and he knew that Mr. Wingo had a gun on his person or in his truck.[36] An officer

of Keener's training and experience would know that alleging a smell of marijuana

would allow him to search a vehicle, as long as there was marijuana somewhere in

the vicinity.[37] Officer Keener's knowledge of the gun and his knowledge of the law

makes his testimony during the hearing that he was "focused on finding marijuana"

incredible.

Officer Keener's knowledge of the law is also demonstrated by his actions.

Officer Keener first alleged that he smelled marijuana while he was handcuffing Mr.

---

[33] Doc. No. 44 at 12 (Counsel: "Okay. Did Mr. Wingo give you any information about the marijuana that you had smelled and that was found during the search incident to arrest? Keener: "Yes. He did -- he did claim possession of that and said he had found it a night before at a nightclub.").

[34] *Id.* at 32 (Counsel: "Did you find any evidence outside of the marijuana on his person that there was any marijuana being smoked through maybe ashes or a marijuana cigarette or anything else in the vehicle?" Keener: "No.").

[35] Doc. No. 47 at 3 n.2 ("The undersigned credits Officer Keener's testimony that he smelled the odor of marijuana emanating from the truck cab when defendant got out of the truck, because he was then a very experienced law enforcement officer, marijuana was found on [Mr. Wingo's] person after he alighted from the truck, in a post-arrest statement [Mr.] Wingo admitted possessing marijuana that morning (Doc. 44 at 12), and Officer Keener testified that, when the officers entered the truck to search it, they were focusing on finding marijuana (Doc. 44 at 34-39).").

[36] Doc. No. 47 at 2 ("The officers learned from Det. Norberg that the victim of the domestic assault said that Wingo carried a .380 Ruger pistol either in the sunglass holder of his truck or in his waistband.").

[37] *See* Doc. No. 44 at 10. (Officer Keener struggled to remember exactly what it was that formed the basis for the automobile search. Counsel: "[D]id you detect anything that might lead you to believe that there was further contraband in the area?" Keener: "Yes. There was a -- the odor of marijuana coming from inside the truck, the pickup truck.").

Wingo. Yet he failed to react or even mention this malodorous experience to his fellow officers. Instead, the officers walked Mr. Wingo to the back of the truck for a search incident to arrest. Despite the immediately recognizable odor that had been assaulting his nose,[38] Officer Keener delayed searching the vehicle until marijuana was found on Mr. Wingo's person.[39] Furthermore, Officer Keener is the only person who smelled this "strong odor." He never told the other officers about it. He never asked Mr. Wingo about it. No other officer mentioned the smell of marijuana during the search incident to arrest, during the interview, or at any other time.

Officer Keener did testify that they were focused on finding marijuana. Yet the only marijuana they found was outside the truck—an enclosed plastic baggie of about 3 grams in Mr. Wingo's shorts.[40] Nothing—not even marijuana ashes—were found in his truck.[41]

Finally, the Order fails to mention the fact that Officer Keener does not know how to distinguish between raw marijuana and burnt marijuana. Instead, what Officer Keener testified to is that typically, he will just "say it's marijuana."[42] Training and an ability to distinguish between raw and burnt marijuana are key to credibility determinations, as is a delay between a smell and a search.[43] Since Officer Keener admitted he is unable to make the distinction, and since there was a

---

[38] Officer Keener cannot distinguish between raw and burnt marijuana. *See* n. 42, *infra*.

[39] Doc. No. 47 at 3.

[40] Doc. No. 45 at 6.

[41] Doc. No. 47 at 4.

[42] Doc. No. 44 at 32 (Counsel: "So I mean do you know the distinction between fresh marijuana and burnt marijuana?" Keener: "I -- again, I -- typically, when it's marijuana, I just -- I say marijuana because I don't know whether it's burnt or not. I don't want to speculate. You know, it was just marijuana.").

[43] *See* n.27-28, supra.

substantial delay between the time of the smell and the time of the search, the Order's

credibility finding was clearly erroneous and suppression is warranted.

Respectfully submitted,

/s/Tyler K. Morgan
TYLER K. MORGAN
Assistant Federal Public Defender
1010 Market Street, Suite 200
St. Louis, Missouri 63101
Telephone: (314) 241-1255
Fax: (314) 421-3177
E-mail: Tyler_Morgan@fd.org

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2021, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Jillian Anderson, Assistant United States Attorney.

/s/Tyler K. Morgan
TYLER K. MORGAN
Assistant Federal Public Defender
